MENCKE v. A CARGO OF JAVA SUGAR ex SHIP BENLARIG et al.

(Circuit Court of Appeals, Second Circuit. April 3, 1901.)

No. 96.

SHIPPING—CONSTRUCTION OF CHARTER—EXPENSE OF LIGHTERAGE.

A charter of a vessel to carry a cargo of sugar from Java provided that she should discharge as near the port of discharge as she could safely get, and deliver the cargo, always afloat, in a customary place and manner, at the dock directed by charterers. It also contained a not unusual provision that lighterage, if any, to deliver the cargo at the port of destination, should be paid by the receivers, any custom of the port notwithstanding. As authorized by the charter, New York was designated by the charterers as the port of delivery, and the dock of the consignees, which was above the Brooklyn Bridge, as the place of discharge. Such dock was a safe one, at which the vessel could discharge afloat, and was a customary place, from 75 to 85 per cent. of all sugar received at New York being discharged at docks above the bridge, but the ship was equipped with immovable iron masts of exceptional height and unusual construction, which prevented her from passing under the bridge unless they were cut off, and she was consequently discharged by lighters. There was no custom of the port in respect to such cases, and the evidence showed but three previous cases in which vessels had been unable to pass the bridge by reason of the height of their masts, and in such cases the masts had been cut. *Held*, that the provision of the charter requiring the consignee to pay the cost of lighterage was not intended, and could not fairly be construed, to apply to conditions so unusual; and that since the inability of the vessel to reach the dock, which 99 per cent. of all vessels could reach safely, was due solely to her exceptional construction, the cost of lighterage must be borne by the owners, in the absence of express provision in the charter to the contrary.

Appeal from the District Court of the United States for the Eastern District of New York.

This is an appeal from the decree of the district court for the Eastern district of New York in favor of the libelant. The facts of the case are stated by the district judge (99 Fed. 298) as follows: "The Benlarig was chartered in London, July 1, 1898, by her owners, to Erdmann & Sielcken, of Batavia, to carry a cargo of sugar from Java. The charter party, among other things, states that the vessel, 'being so loaded (and dispatched), shall (unless ordered to a direct port of discharge, on signing last bills of lading) therewith proceed to Barbadoes, thence Queenstown or Falmouth (as directed by charterers or their agents) for orders, to discharge always afloat, either at a safe port in the United Kingdom or on the continent of Europe between Havre and Hamburg (both included), Rouen excluded, or at option of charterers to order vessel from Barbadoes to proceed to Delaware Breakwater for orders, to discharge at New York, or Boston, or Philadelphia, or Baltimore, or so near the port of discharge as she may safely get, and deliver the same, always afloat, in a customary place and manner, in such dock as directed by charterers, agreeably to bills of lading, on being paid freight in full of all port charges, pilotage, and primage as customary at port of discharge,' etc. Section 4 of the charter party provides: 'All goods to be brought to and taken from alongside of the ship, always afloat, at the said charterer's risk and expense, who may direct the same to the most convenient anchorage; lighterage, if any, to reach the port of destination, or deliver the cargo at port of destination, remains for account of receivers, any custom of the port to the contrary notwithstanding.' From Batavia the ship went to Barbadoes for orders, pursuant to which she came to New York. Bills of lading had been issued for the cargo, making it deliverable at the port of discharge, as per charter party, to Messrs. Winter & Smillie as agents, or to their assigns, he or they paying freight for the said sugar as per charter party. The ship's documents were delivered to Czarnikow, MacDougall & Co., of New York, who transferred the same to the claimants. After due notice of the ship's arrival, the claimants gave orders in writing for the discharge, above the Brooklyn Bridge, at their refinery at the foot of Pearl street, Brooklyn. As the master considered that two of the ship's masts would not go under the bridge, arrangements were made between the parties for delivering the cargo by lighters, and payment of the expense thereof was deferred for subsequent determination. The question here is whether such expense should fall upon the libelant or claimants. The Benlarig was a square-rigged, iron ship. Her three masts were built up solid from the bottom to the top, and were composed of cylindrical plating riveted together, and internal transverse angle iron braces. * * * The clear height of the Brooklyn Bridge above the mean high water is 135 feet, and the mean rise and fall of the tide is $4^5/_{10}$ feet. At dead low water the ship could not pass under the bridge without cutting off about 5 feet from the mainmast and foremast, while safety required greater removal from such masts to avoid the effect of any disturbance of the water. After the ship should have been discharged it would be necessary to cut off an additional portion of such masts, and also some part of the mizzenmast, to allow her to repass under the bridge, unless a return cargo could have been taken above the bridge, or the ship could have gone out by the East river and Long Island Sound. There were but two means of escaping this mutilation of the masts, for the purpose of discharging the cargo: First, by approaching New York from the east, through Hell Gate. All shipping experts called by the claimants testified that they had never heard of a ship from Java pursuing that course. It may, therefore, be concluded that such alternative was contrary to the expectations and understanding of all parties to this contract, or of any other contract for the carriage of sugar from Java. The remaining alternative was to lighter the sugar; and the question is upon which party the expense of such lighterage should fall."

There is no custom in the port of New York respecting the course to be pursued by vessels directed to discharge above the bridge which have immovable masts too high to permit a passage beneath the bridge. Three of such cases were known by the witnesses to have existed, and in these the masts were cut.

One of the vessels had a steel mast. Vessels with immovable steel masts of that height have not been built until within the last 10 years, and are very few in number,—perhaps not over a dozen. From 75 to 85 per cent. of the sugar arriving at New York in vessels is discharged at the docks of refineries above the bridge. Charters sometimes provide that the vessels shall not go above the bridge, and sometimes that charterers have the right to order the ship above the bridge, they paying the expense thereof. The expense of housing the masts or of cutting a wooden mast is not very large. The form of articles 1 and 4 of the charter in question is a very familiar one to sugar refiners.

Wilhelmus Mynderse, for appellants.

J. Parker Kirlin, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts as above). On the construction of the two provisions of the charter party which apparently are applicable to this case, the question, not easy of solution, arises. By article 1, the vessel was to discharge as near the port of discharge as she could safely get, and deliver the cargo, always afloat, in a customary place and manner, at the dock directed by charterers. New York was one of the designated ports, and no question arises as to her safety. In this respect, the facts of the case differ from those in Re Arbitration between Goodbody & Co. and Balfour, Williams & Co., 8 Asp. 503, in which Manchester was held not to be a safe port for the vessel in question, because, by reason of the height of her masts, she could not get under Runcorn Bridge, about 24 miles from Manchester, and about 12 miles from the entrance of the canal, and the ship would have to be dismantled 24 miles from the port. The Benlarig was in the port of discharge, and the Arbuckle dock was a safe one, where she could be always afloat, and a customary place for the discharge of sugar. The exceptional height of her masts and the unusual character of their construction alone interfered with the vessel's performance of her part of the contract, and, unquestionably, but for article 4, she would have been obliged either to deliver or to pay for the damages occasioned by nondelivery at the Arbuckle dock. Article 4 provides that lighterage, if any, to deliver the cargo at the port of destination, is to be paid by the receivers, any custom of the port notwithstanding. The argument of the libelant by which the two claims are sought to be made harmonious, and in which the district judge concurred, is that the cargo is to be delivered at the usual and customary place designated by the charterers or by the single consignee of the entire cargo: but if such delivery is prevented by a permanent cause, such as lack of depth of water or permanent obstructions at the port, and the cargo must be lightered, the expenses of such lightering are to be borne by the charterers. In the application of the construction, the libelant urges that as the Brooklyn Bridge prevented a delivery beyond it, and as a mutilation or destruction of the ship's masts would be a serious injury, and recourse must be had to lighters, the state of facts provided for by article 4 existed.

Article 4 is a well-known provision, and was introduced into charter parties originally to provide for the payment of lighterage

when the vessel was unable to deliver the cargo at the dock to which she had been assigned from a cause to which vessels generally might be expected to be subject, such as shoal water or a bar; and if the Brooklyn Bridge was an obstruction to vessels generally, or to such a proportion of vessels as to have become a well-recognized impediment to navigation, the construction of the libelants would be correct. This form of charter is the one commonly used in the sugar, trade for the purpose of meeting a customary condition of affairs in different ports, and in regard to which a custom of the port would naturally exist. The facts in this case were exceptional and eccentric. When vessels having too high masts which can be lowered are ordered to go above the bridge, the masts are housed and the vessels proceed. In the rare instances which appear in the record of immovable masts of excessive height they were cut. In this case the vessel had steel masts of excessive height, and a recent, exceptional, and immovable method of construction, which makes the repair of the masts a serious affair. The owners knew, or had reason to know, of this peculiarity, but did not insert a provision in the charter that she should not be required to go above the bridge, but preferred to rely upon article 4. The case is that of the claimed application to novel circumstances of a clause intended for a different set of circumstances, and is as if a vessel, unable by reason of its novel construction to reach a dock which 99 per cent. of vessels do reach, should desire to place the expenses of lighterage upon the charterers under article 4. Such an attempt would be, and the facts of this case are, within the letter of the article, but not within its spirit. The decree of the district court is reversed, with costs of this court, and the case is remanded, with directions to dismiss the libel, with costs.